D. John McKay
Law Offices of D. John McKay
117 E. Cook Ave.
Anchorage, Alaska  99501
Telephone:  (907) 274-3154
Facsimile:   (907) 272-5646
E-mail:   mckay@alaska.net

Attorney for Non-party Respondent
James B. Gottstein, Esq., Law Project for Psychiatric Rights, Inc.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

―――――――――――――――――x
                                                      )
In re: ZYPREXA                              )        04-MDL-1596 (JBW)
PRODUCTS LIABILITY LITIGATION   )
                                                      )
―――――――――――――――――x

**RESPONSE OF JAMES B. GOTTSTEIN TO ORDER TO SHOW CAUSE ISSUED AT BEHEST OF DEFENDANT ELI LILLY AND COMPANY <u>AND JOINDER IN REQUEST FOR MODIFICATION OF PROTECTIVE ORDER</u>XX**

Non-party Respondent Alaska attorney James Gottstein ("Gottstein") has been directed to show cause why he should not be required to submit himself and his office computer and records to immediate examinations by Eli Lilly and Company ("Lilly") in New York and in Philadelphia.  There are a number of reasons why this request should be denied, as detailed below.  It is unnecessary, unreasonable, unduly burdensome, and intimidating.  The fundamental objection, though, is that the only legitimate purpose for the measures requested by Lilly and embodied in the Show Cause order is to pursue potentially ruinous contempt sanctions against Mr. Gottstein for alleged violation of this

court's August 3, 2004 Case Management Order No. 3 ("CMO-3").[1]  Mr. Gottstein did not violate this protective order.  Nor did Dr. Egilman violate the protective order when he sent Mr. Gottstein documents on December 12, 2006, pursuant to a subpoena issued in an Alaska case.[2]  (The documents at issue, produced by Dr. Egilman in response to Mr. Gottstein's subpoena, are referred to herein as the "Zyprexa Documents.")  Nor, even assuming, *arguendo,* that Dr. Egilman had violated CMO-3 in producing these documents to Mr. Gottstein, did Mr. Gottstein aid and abet any such violation by Dr. David Egilman.  The absence of an underlying violation by Dr. Egilman, and in any event, the lack of legal culpability of Mr. Gottstein if there were any such violation means, of course, that there is no basis for an injunction against distribution of documents on the grounds that their disclosure and subsequent dissemination by Mr. Gottstein violated a court order.  Likewise, with respect to the Order to Show Cause, if there was no violation, there can be no contempt.  And if there were, Mr. Gottstein's conduct, under the circumstances and applicable law discussed herein, does not subject him to sanctions for contempt.

In the Alaska case, Mr. Gottstein and the nonprofit public interest law firm Law Project for Psychiatric Rights, Inc. ("PsychRights") are acting as pro bono counsel for a mental health patient raising certain issues relating to administration of antipsychotic drugs to those incapable of making their own informed decisions, and further addressing

---

[1] Lilly sent a letter to the court Friday, served Friday evening upon counsel, stating that it intends to seek imposition of sanctions against Dr. Egilman and Mr. Gottstein "for their willful and deliberate violation of CMO-3."  Despite the court's directive to specify its intentions, however, Lilly's letter gives no clue as to whether it plans to seek both criminal and civil contempt sanctions.

[2] *In re: Guardianship of B.B.,* Case No. 3AN-04-545 P/G, Alaska Superior Court, Third Judicial District at Anchorage.

important issues Mr. Gottstein and PsychRights have litigated in recent years and plan to litigate in the future. *See* accompanying January 16, 2007, Declaration of James B. Gottstein ("Gottstein Decl."), ¶2-4, and *see*, Report on Multi-Faceted Grass-Roots Efforts To Bring About Meaningful Change To Alaska's Mental Health Program, attached as Exhibit 2 thereto. Most notably, these have included successful prosecution of a forced drugging case, in which concerns about prescription of Zyprexa was a prominent aspect – a case that culminated in a favorable ruling for Mr. Gottstein's client and other mental health patients from the Alaska Supreme Court[3] in *Myers v. Alaska Psychiatric Institute*, 138 P.3d 238 (Alaska 2006). *Id.,* ¶2.

CMO-3 specifically contemplates that third parties may request documents from those subject to it, and that these documents may be turned over to the requesting party. Dr. Egilman only violated CMO-3 if he provided documents for the Alaska case without giving Lilly notice and a reasonable opportunity to object. CMO,-3, ¶14. In this case, Mr. Gottstein was absolutely clear with Dr. Egilman that he should produce the documents in compliance with CMO-3, and Dr. Egilman likewise expressed his intent to satisfy the requirements of the protective order. Gottstein Decl., ¶6. Dr. Egilman gave Lilly notice the same day he received the subpoena for the documents at issue, and did not produce them until the next week, after Lilly failed to exercise its rights under CMO-3 within a reasonable time. There was no violation of CMO-3 by virtue of Dr. Egilman's production of the documents in response to Mr. Gottstein's subpoena. And even assuming, *arguendo*, that Dr. Egilman had violated CMO-3 in producing the documents,

---

[3] In Alaska, unlike New York, the trial courts are denominated "superior" courts, and the state's highest court is the "Supreme Court."

Mr. Gottstein did nothing to subject him to contempt proceedings in this court, so that the relief requested by Lilly against Mr. Gottstein is without basis.

Of course, if Lilly does not show in the scheduled hearing that Dr. Egilman did violate CMO-3, and whether or not he did, that Mr. Gottstein was acting in violation of the court's order in obtaining and using these documents, there is no basis for any injunction continuing to prohibit doctors, researchers, mental health rights advocates, psychiatric patients, and the world at large from being able to read or encourage others to read the Zyprexa Documents. This court has made it clear that coming into this hearing, the court does not presume that any violation occurred.[4] On January 3, the court had before it documents previously filed in the case, and specifically noted: " I make no findings of fact with respect to whether any violation of any order of this court has ever been made. I have heard no evidence on the point and I'm not prepared to draw any inferences from any of the materials before me." Tr. of January 3, 2007, Hrg. at 29. At the following hearing, the court emphasized again that it has made "no finding" in this regard, Tr. of January 8, 2007, Hrg. at 28, and it underscored this as well by the striking

---

[4] This is particularly appropriate, since the initial order the parties obtained *ex parte* (a message was left on an answering machine a few hours before the order was entered) from the Special Master late on Friday, December 15. When Mr. Gottstein received this, in an effort to be responsive to the court, but without the benefit of counsel, he hurried to put together an explanation for the Master over the weekend asking him to reconsider, and sent it on Sunday. By the early morning hours (AST) Monday, however, with virtually no notice and still having had no opportunity to secure counsel, he was told to participate in a proceeding before Magistrate Judge Mann, followed quickly by another hearing before District Judge Cogan to endorse the ruling of the Magistrate Judge. While Lilly's briefs and letters have told this court that Mr. Gottstein's appearance before Judge Cogan was "with his counsel," Lilly neglects to point out that the record clearly shows the proceedings before Judge Cogan were held up while Mr. Gottstein got undersigned counsel on the phone and was trying to explain to him what the case was about. The record further reflects that the undersigned objected to the lack of more adequate notice, or opportunity to review the relevant documents (not to mention the objection of court and counsel to a horrible phone connection.)

from the January 4 Order to Show Cause prepared by Lilly Lilly's characterization of Mr. Gottstein's dissemination of the documents at issue as "improper."

To establish contempt, "a movant must establish that (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *Perez v. Danbury Hosp.*, 347 F.3d 419, 423-24 (2d Circ. 2003) (Second Circuit found district court abused its discretion by issuing contempt decree and awarding damages where there was doubt as to wrongfulness of the defendant's conduct); *see also, U.S. v. Saccoccia,* 433 F.3d 19 (1st Cir., 2005) (reversing civil contempt order against attorney for violating protective order). The District Court's contempt power is narrowly circumscribed. *Perez*, 347 F.3d at 423. In this case, Lilly's threatened prosecution of contempt charges against Mr. Gottstein fails on all three counts. Mr. Gottstein, of course, was not and is not a party to the above-captioned Zyprexa MDL, and is not as such subject to CMO-3.

There is no dispute that there was a protective order, or that Dr. Egilman was subject to it. And, while Mr. Gottstein did not see a copy of the protective order until Lilly supplied it to him after the documents had already been produced, he was aware of it because when Dr. Egilman first contacted him, he advised Mr. Gottstein of its existence. Gottstein Decl., ¶4. Mr. Gottstein made clear at that time that Dr. Egilman should comply with whatever the protective order required of Dr. Egilman in producing the documents at issue, and Dr. Egilman clearly expressed his intention to do so. *Id.,* ¶6. The relevant provision of the protective order, ¶14, contemplates that documents subject to this order may be produced to those with no connection with this MDL, pursuant to a

subpoena, if the producing party (Lilly here) fails to object after being given written notice and a reasonable opportunity to object. Mr. Gottstein subpoenaed the documents at issue on December 6, 2006. The record shows indisputably that Dr. Egilman, in compliance with the relevant provision of the protective order, gave detailed written notice to Lilly, by fax as well as by mail, immediately upon his receipt of the subpoena, *see,* Lilly Ex. C,[5] a December 15, 2006, letter from Dr. Egilman to Lilly counsel Brewster Jamieson reciting that on December 6th he had faxed, and Lilly's General Counsel had received, this letter. Lilly eventually provided to Mr. Gottstein the copy of this letter bearing the December 6 receipt stamp of Lilly's counsel Armitage. *See* Gottstein Aff., Exhibit 3, December 6, 2006, letter from Dr. David Egilman to Eli Lilly General Counsel Robert Armitage.

Further protracted proceedings and expense are not necessary to know there is not a contempt case here against Mr. Gottstein. The absence of any one of the three elements noted above is fatal to a contempt case, and here, none of the three is present.

1. No Clear and Unambiguous Order  Lilly should not be allowed to drag this out further because it is obvious already that it can't be proven that release of the documents in response to the Gottstein subpoena "failed to comply with a clear and unambiguous order." *Perez*, at 323. There are certainly other portions of the protective order that are clear and unambiguous. For example, it clearly and unambiguously states that before Dr. Egilman could have turned over trade secrets to a competitor of Lilly pursuant to the provisions of CMO-3, he would have needed to give Lilly written notice and three (3) business days to object. CMO-3, ¶6, p.6. It was reasonable to resolve the ambiguity of

---

[5] Unless expressly noted otherwise, as used herein, "Lilly Exhibits" refers to the exhibits filed with Lilly's January 9, 2007, Memorandum.

¶14 by construing it the same way; it might be reasonable to resolve the ambiguity in another way. The relevant point is that ¶14 is unclear, and ambiguous, in this critical respect. Noncompliance with it, therefore, cannot form the basis for a finding of contempt. As to this first prong, "[t]he test is whether the putative contemnor is 'able to ascertain from the four corners of the order precisely what acts are forbidden.' " . . . The purpose of this "four corners" rule is to assist the potential contemnor by narrowly cabining the circumstances in which contempt may be found. It is because "[t]he consequences that attend the violation of a court order are potentially dire," . . . that "courts must 'read court decrees to mean rather precisely what they say,' " *U.S. v. Saccoccia,* 433 F.3d at 28. (internal quotes omitted). *Comp., Perez,* 347 F.3d at 424 (court must confine itself to the four corners of the decree when contemplating contempt, and not try to discern its scope "by reference to what might satisfy the purposes of one of the parties to it," and "may not impose supplemental obligations on the parties even to fulfill the purposes of the decree more effectively." [internal cites omitted]). The "four corners rule" is meant to protect alleged contemnors, *Soccoccia,* 433 F.3d at 29. Even if there are reasonable arguments supporting a contrary interpretation, "the law of civil contempt requires much more precision." *Id. at 30.* The protective order alleged to have been violated "must have 'left no reasonable doubt' that an attorney would be violating its terms were that attorney to (proceed as he did)." *Id*. at 28, citing *Project B.A.S.I.C v. Kemp,* 947 F.2d 11, 17 (1st Cir. 1991).

   The court asked for good cause to be shown; this is good cause why Mr. Gottstein should not be required to be subjected to what Lilly is seeking. The court "must read any ambiguities or omissions in … a court order as redound[ing] to the benefit of the person

charged with contempt." *Saccoccia*, 433 F.3d at 28, because "civil contempt [is] a serious sanction requiring unmistakably clear notice to the person involved of what is required." *Id* at 31.

    2. <u>Noncompliance Not Shown</u> The second element of contempt is also clearly absent here. Lilly has not proved noncompliance with the CMO-3. The protective order prohibits those subject to it from releasing documents in response to a subpoena only if Lilly fails to object within a reasonable time after being given written notice of it. CMO-3 is silent about what is reasonable notice. Certainly there is no proof of noncompliance that is "clear and convincing." *Comp., Perez*, at 425. For this reason also, there is no reason to grant Lilly's request.

    3. <u>Lilly Has Not Shown Failure to Diligently Comply in a Reasonable Manner</u> Mr. Gottstein, even though he had no obligation under the protective order, diligently attempted to ensure compliance with it in a reasonable manner. Likewise, it appears that Egilman attempted to comply in a reasonable manner, though if he hadn't, contempt would still be unavailable as to Mr. Gottstein. Assuming, *arguendo,* that Dr. Egilman had violated the protective order, as in *Perez,* Mr. Gottstein would not be directly responsible for that. *Id* at 425, citing *Alemite Mfg.Corp. v. Staff,* 42 F.2d 832, 833 (2d Cir. 1930) (noting that "it is not the act described which the decree may forbid, but only that act when the defendant does it.") In this case, Mr. Gottstein subpoenaed several witnesses in connection with his Alaska case, including Dr. Egilman. He told Dr. Egilman multiple times to comply with whatever the protective order required, and Egilman said he was complying with it. Mr. Gottstein suggested he seek help from legal

counsel. Dr. Egilman indicated that three business days could be construed as sufficient notice to comply. Gottstein Decl., ¶6.

There is clearly fair ground of doubt as to the wrongfulness of Mr. Gottstein's conduct. Under these circumstances, it would be wrong for the court to "resort to the potent weapon of a contempt order." *Perez* at 425, citing *King v. Allied Vision, Ltd.,* 65 F.3d 1051, 1058 (2d Cir. 1995)

<u>The Court Has Personal Jurisdiction Over Mr. Gottstein Here If, and Only If, He Aided and Abetted A Violation By Dr. Egilman</u>

Mr. Gottstein has not conceded that this court has personal jurisdiction over him, and has continued to preserve this objection, limiting his appearance as a respondent to this court's orders. Mr. Gottstein wishes to make clear, however, that he is not asserting any such objection in an effort to delay or complicate these proceedings. He has the greatest respect for this court, and the record is clear that he has been voluntarily complying diligently with what the court has ordered, even if he might question the basis for the orders or authority to issue them. His substantial and good faith compliance with the court's orders, and with Lilly's requests that he not further distribute the documents even before a court order was obtained. Gottstein Decl., ¶8, and Ex. 4 thereto. In addition, he has made exceptional effort to appear with counsel personally for the January 16 hearing to accommodate the court's stated desire to have everyone present if possible to facilitate a meaningful, plenary resolution of all matters.

That said, Mr. Gottstein is compelled at this time to preserve such objections, notwithstanding his desire to cooperate in resolving this matter, because of Lilly's generalized but persistent and intimidating threats of unspecified contempt proceedings against him. While it is generally true that one named in an injunction must comply with

it, even if he believes it is wrong, the same is not true if the court lacks jurisdiction.[6] Mr. Gottstein is not a party to MDL 1596, nor was he a party or endorsee of CMO-3. The mere fact that an attorney in Alaska subpoenas a witness from Massachusetts who serves as an expert in this case, for purposes of another case, would not give this court jurisdiction over the Alaska attorney.

There seems to be agreement that whether and when a court's order can be enforced against a nonparty was perhaps best explained by Judge Learned Hand in the *Alemite* case, *supra*:

> No court can make a decree which will bind any one but a party; . . . it cannot lawfully enjoin the world at large, no matter how broadly it words its decree. . . . Thus, the only occasion when a person not a party may be punished, is when he has helped bring about, not merely what the decree has forbidden . . . but what it has the power to forbid, an act of a party. This means the respondent must either abet the defendant or be legally identified with him.

Id. at 833 (emphasis added). In this case, Mr. Gottstein at most helped bring about the distribution of documents, which he had a right to do, but he did not aid and abet any wrongful act of a party, if there were one. Mr. Gottstein would need to concede the court's jurisdiction to enforce its orders had he aided and abetted a violation, or been legally identified with one who violated the order; similarly, Lilly must concede that Mr. Gottstein's acts were beyond the reach of this court if he did not so act. Here there was neither a violation by Egilman in producing the documents to Gottstein that could be aided and abetted, nor, if there had been a violation, was there aiding and abetting by Mr. Gottstein.

---

[6] "An injunction issued by a court which lacks jurisdiction of he subject matter <u>or the person</u> is void. Such an order has no legal effect, and if the defendant disobeys that order, he is not in contempt. Stated differently, the fact that the order is void constitutes a defense to a subsequent charge of contempt." (emphasis added) Dobbs, Remedies. §2.8(6) at 213.

### Mr. Gottstein Was Free To Publicize The Documents As He Did

Because Mr. Gottstein did not participate in any culpable way in any violation of the court's order when he received the documents pursuant to his subpoena, he was free to use them as he saw fit, and he did. Much of Lilly's umbrage seems directed at Mr. Gottstein's unabashed and candid acknowledgement that he wanted to make these Zyprexa Documents quite public, as well as use them in his lawsuit, once he had obtained them pursuant to his subpoena. For the same reasons he represents B.B. in his Alaska case, and has represented other clients in PychRights' campaign of strategic litigation against forced drugging and electroshock treatment, Mr. Gottstein also clearly wanted to make these documents available to other mental health advocates, academic researchers, regulators, scientists, and the millions who take these drugs and have an interest in more, not less, information about them.

In *Condit v. Dunne*, 225 F.R.D. 113 (S.D.N.Y. 2004), the court recognized the right of a litigant to disseminate documents and information obtained in discovery, though the documents were not part of the public record in the case, *See also, Hawley v. Hall*, 131 F.R.D. 578, 581 (D. Nev. 1990) (materials obtained in discovery presumptively open to public inspection, and without applicable protective order, materials may be used by a party for any purpose, including dissemination to the public.)

In *Flaherty v. Seroussi*, 209 F.R.D. 295 (N.D.N.Y. 2001), a case relied upon by the court in *Conti,* the plaintiff's lawyer was adamant about his "intention to publicize the Mayor's deposition, championing 'the rights of the citizens'" and despite this guarantee of imminent public dissemination, the court refused to apply a protective order because the facts supported a strong public interest in free access to discovery documents where the

litigation involved "elected officials and the performance of their governmental responsibilities." Id. at 299-300.

In *Condit,* the court noted that dissemination was warranted in part because the both the case and the substantive issues in the litigation were of public concern, as is the case here. 225 F.R.D. at 119. It also rejected claims that dissemination of the document was inappropriate because the media might report from it selectively or out of context, *id.* at 118. The court in *Condit* also noted that the attorney in that case had postings concerning the case on his website, but found no problem with this, as he was not using the website for commercial advancement. *Id.* at 17.

The desire to make such documents publicly available is understandable, as are rulings acknowledging that such dissemination of information serves vital interests and is entirely lawful and appropriate. *See, e.g., Falise v. American Tobacco Co.*, 193 F.R.D. 73, 82-83 (S.D.N.Y. 2000) (district court affirmed magistrate judge's order requiring production of approximately 37,000 documents, both because they had already been released by Congress[7] on the internet and because release was in the public interest).

The answer to the question whether we should be satisfied with a system that requires officers of the court to remain silent while more and more people suffer harm from unsafe products is obvious. *Comp.,* the Agent Orange case, where this court set

---

[7] In *Falise,* this court observed that "any backhanded attempt by the courts to muzzle Congress even partially by covering up in the investigative stage of a litigation what that organ of government has revealed could be construed as a form of unjustified interference with, and criticism of, another branch of government." 193 F.R.D. at 74. Even though Congressman Waxman returned the documents at issue in an expression of comity to this court, *see* Lilly Exibit M, the court's finding that there was no violation and that the documents are lawfully disseminated eliminates any hint of restraint on the ability of the Congressman's committee to pursue this matter as vigorously as it sees fit.

aside its own secrecy order after settlement because the public and the veterans were entitled to know all of the facts - which might be useful in ongoing research and political decisions on compensation of veterans. *See In re Agent Orange Product Liability Litig.*, 821 F.2d 139, 148 (2d Cir. 1987). And as the judge emphasized in the Bridgestone/Firestone case, once a matter is brought before a court for resolution, it is no longer solely the parties' case, but also the public's. *Etten v. Bridgestone/Firestone*, Inc., 117 F. Supp. 2d 1375, 1380-81 (S.D. Ga. 2000). See *Etten*, 117 F.Supp.2d at 1380-81. The court has noted substantial reasons for the public's interest in such cases, citing the tire case as an example: "It has been said that more than one hundred additional people were killed in cars with Bridgestone tires between the first secret settlement and the media's ultimate uncovering and publicizing of the story." Weinstein, Secrecy in Law and Science, 23 Cardozo L.Rev. 1 (2001). That public interest is equally compelling in this case.

<u>Response to Specific Elements of Order to Show Cause</u>

There is no reason why the court should issue the order requested by Lilly, requiring Mr. Gottstein to do the things set forth in the paragraphs 1 through 3 of the Order to Show Cause. The relief requested should be moot after the January 16 hearing, for two reasons: 1) it should be evident by the conclusion of the hearing, or simply from this briefing, that contempt proceedings against Mr. Gottstein are unnecessary and inappropriate, and 2) because even if contempt proceedings were not contrary to law under the circumstances of this case, a sufficient record will exist to determine whether there should be contempt proceedings against Mr. Gottstein without necessity for the further burdensome, expensive, and overreaching discovery contemplated by Lilly. Without waiving this position, Mr. Gottstein wishes to address a few particular problems

with the contents of the show cause order in case the court decides to adopt some version of it and allow any additional proceedings.

<u>Deposition</u>  Lilly has asked the court to require Mr. Gottstein to travel to New York for a deposition within days.  Mr. Gottstein objects to being required to do so, involuntarily, and would have the right to have any subpoena effectuating this quashed. *See,* F.R.Civ.Pro. 45(b)(2) and 45(c)(3)(A)(i), (ii) and (iv).  However, the court made clear in the January 8 hearing that it would prefer to have counsel and witnesses present, if possible, and perhaps more significantly, that it intended to conduct a full evidentiary hearing and hear all arguments, over two days if necessary, and to "expedite discovery on any procedures for contempt or for modification or for dissolving of the injunction." Given the important and potentially dispositive nature of this hearing, and the time the court has set aside for it, Mr. Gottstein has chosen to accommodate the court and make himself available to it in the hope of bringing this matter to a resolution.  It is likely that Lilly's request to depose Mr. Gottstein to see whether contempt proceedings are appropriate will be moot after the January 16 hearing.  If, however, the court finds that this is not the case, and that Mr. Gottstein must be deposed, he will not object to this occurring this week, subject to appropriate restrictions on scope and burdensomeness. With this exception, when he has traveled to New York for this purpose voluntarily, he would assert his rights not to do so.

<u>Production of Computers and Other Office Equipment</u>  The Order to Show Cause, in ¶2, appears to seek a highly unreasonable, unjustifiable, and unduly burdensome requirement that Mr. Gottstein produce his law office's computers, hard drives and other equipment and hardware to Ms. Gussack, in Philadelphia, immediately.  Specifically, it

would require Mr. Gottstein to immediately produce in Philadelphia "copies of any and all documents and information including, but not limited to, all computers(s), hard-drives, (and) other electronic storage media . . . ." (sic)  We understand that the Order was drafted by Lilly, not by the court.  In fairness, we believe that Lilly does not literally mean to have the court order Mr. Gottstein to produce his computers, hard-drives and other electronic storage media pursuant to paragraph 2, but if Lilly were allowed to proceed further after the Tuesday hearing, this would need to be corrected.  It appears that this provision is either inartfully drafted, or the victim of accidental editing, and that it was probably meant to ask for documents and information that might be found on Mr. Gottstein's computers and other equipment.  This interpretation is bolstered by the attempt, in paragraph 3, to seek production of computers only <u>if</u> Mr. Gottstein were to have deleted or destroyed documents properly responsive to the Order, which he has not.

      <u>Production of Computers Pursuant to ¶3</u>   In the immediately preceding sentence, the description of Lilly's request for production of relevant computers in the event that documents on them had been deleted or destroyed was modified by the appropriate and common-sense addition of the word "properly" before "responsive to this Order."  Without waiving objections under, or comparable to those provided in, Rule 45(b), (c)(1), (c)(3)(A)(i),(iii) and (iv), and 45(d)(1)(D), or other objections to which he may be entitled, Mr. Gottstein notes that the question is moot, though, because he has not destroyed or deleted documents that would trigger this requirement --  that is, unless ¶3 were to be read in a wholly unreasonable manner that the Order, as drafted, would literally encompass.  This problem could arise in at least two ways:  1) if the destruction or deletion referred to in the order were deemed to include the action taken by Mr.

Gottstein to remove the Zyprexa Documents at issue from his computer and related hardware after the court ordered that this be done, and after making a copies of the removed documents and providing them to Master Woodin, or 2) if the "destruction or deletion" language were read to apply to any documents literally, though unreasonably, "responsive to this Order." For example, as drafted, ¶3 would require Mr. Gottstein to produce his computer for forensic examination if he has deleted any e-mail from his wife asking that he pick up milk on the way home ("any documents that refer or relate to Terrie Gottstein" are required), or if he has deleted communications from a prospective or former client who might have sought legal representation concerning forced drugging long before Mr. Gottstein had ever hear of Dr. Egilman (e.g., any documents "referring or relating to Zyprexa" without limit in time or purpose).

Production of Documents Pursuant to ¶2  As noted, the production to be required pursuant to ¶2, like the deposition, is unnecessary and should be moot after the scheduled proceedings. In any event, as drafted, they are, *inter alia*, in many respects overbroad, burdensome, vexatious, and not reasonably calculated to lead to admissible evidence, and subject to restriction under the provisions of Rule 45 noted above. They would require production of privileged documents, and documents having nothing to do with this controversy, including, e.g., documents from before Mr. Gottstein had ever heard of Dr. Egilman or otherwise become involved in the matter at hand, and communications with clients concerning medical matters that have nothing to do with the instant controversy, to cite only a few problems. That said, Mr. Gottstein wishes to assure the court that he has attempted to prepare to substantially and in good faith comply if and when he were required to produce documents reasonably responsive to these requests, now or hereafter.

**CONCLUSION**

For the reasons stated above, James Gottstein respectfully requests that this court deny Lilly's requests that he be subjected to further discovery or other proceedings, or otherwise required to participate in this case. Given the absence of a violation and the lawfulness of his distribution of the Zyprexa Documents, Mr. Gottstein also supports the requests by others appearing in the case to dissolve the injunction, and, even better, to modify the protective order to acknowledge that disclosure of these documents is not only a *fait accompli*, but also is in the public interest.

Dated: January 16, 2007                      Respectfully submitted,

/s/

D. John McKay
*Pro hac vice application pending*
Law Offices of D. John McKay
117 E. Cook Ave.
Anchorage, Alaska 99501
Phone: (907) 274-3154
Fax:    (907) 272-5646
E-mail:mckay@alaska.net