FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.
★ JAN 30 2007 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x

In re: ZYPREXA
PRODUCTS LIABILITY LITIGATION                    INVITATION & ORDER

------------------------------------------------------x

THIS DOCUMENT RELATES TO:
ALL ACTIONS                                       04-MDL-1596

------------------------------------------------------x

JACK B. WEINSTEIN, Senior United States District Judge:

    Alex Berenson, reporter for the New York Times, is invited to voluntarily appear on February 7, 2007 at 10:00 a.m. in the Federal Courthouse, 225 Cadman Plaza East, Brooklyn, New York, Courtroom 10B South, to explain the circumstances of his obtaining documents sealed by the court. If Mr. Berenson chooses to appear, he may be accompanied by his attorney, will be sworn, and will be subject to cross-examination.

    This invitation is intended to permit Alex Berenson to confront testimony received at a hearing in this court on January 16-17, 2007 implicating him in a conspiracy to obtain and publish confidential documents sealed by this court.

    The attention of Mr. Berenson is directed to the following portions of a transcript of the January 16-17, 2007 hearing. References to "Gottstein" are to James Gottstein, an attorney in Alaska who allegedly forwarded documents received from Dr. David Egilman to Mr. Berenson. Dr. Egilman was a plaintiffs' expert who had agreed not to violate this court's order sealing these documents, but who then sent them to Mr. Gottstein, who in turn transmitted them to Mr. Berenson and others.

> Q [attorney for Eli Lilly & Company]: . . . Did you ever have
> communications with Dr. Egilman between the time that you received

1



the documents and December 17 when the New York Times published a portion?

A [Gottstein]: Did I have communications with Dr. Egilman?

Q: Yes.

A: Yes.

. . . .

Q: What did you talk about?

A: I think most of it was around the New York Times story and their desire to have – to break it.

. . . .

The Court: You say their, who do you mean?

A: The New York Times desire to be able to break the story.

Q: What did Dr. Egilman say about that?

A: That was basically it . . . .

. . . .

I mean there were other news outlets that I was going to send them to. And I ended up not doing that.

Q: Why?

A: To accommodate the New York Times's desire to break the story.

Q: Who communicated that desire?

A: Well, Alex Berenson called me about that.

Q: What did he say?

A: He said basically that if anybody else breaks it, they are not going to run the story.

2

> Q: So what? Why was that important to you?
>
> A: Well, because I think the New York Times is maybe the best place to have had this happen from my perspective.
>
> Q: And from Dr. Egilman's perspective also?
>
> . . . .
>
> A: I think he wanted the New York Times to be the first to publish it.
>
> Q: Why do you think that?
>
> A: Because he wanted me to not send it to other news outlets.
>
> Q: What did he tell you about why you shouldn't send it to other news outlets?
>
> A: Basically, the same thing, that the New York Times wouldn't run it if someone else broke it.

Tr. of Hr'g, 81-83 (January 17, 2007).

> Q: . . . . Before you talked to Dr. Egilman on November 28, did you have any discussions with Alex [Berenson] about the Zyprexa documents in this litigation?
>
> A: No.
>
> Q: After that conversation with Dr. Egilman on November 28th, how soon after that conversation did you start to have communications with Alex Berenson about the Zyprexa documents?
>
> A: Within a few days, I think.
>
> Q: How did that communication start? Did you call him or did he call you?
>
> A: I believe he called me.
>
> Q: And how did he get your name, do you know?

3

. . . .

A: Do I know how? I think that he was independently aware of what I was doing.

Q: How do you think he became independently aware of what you were doing?

A: I believe that I had e-mailed him before.

Q: Before what?

A: Maybe earlier in the year or a couple of years ago sometime because I had been trying to get publicity about this stuff for years really. So I made contacts with a lot of reporters and I believe that I had contacted Mr. Berenson before.

Q: What caused him to call you three days after your conversation with Dr. Egilman?

A: This would be around what? The second of December or something?

Q: Early December.

A: What caused him to call me? . . . . I think he was working on a story on this.

Q: Why did he call you? What did he tell you when he called you?

A: He told me that he had given Dr. Egilman my name.

Q: Alex Berenson had given Dr. Egilman your name?

A: Yes.

Q: Is that how Dr. Egilman came to contact you on November 28?

A: I think so.

Q: And you said that he had told you that he had given Dr. Egilman your name. Help me understand that. What did he say?

4

A: He said that Dr. Egilman had some documents that he wanted to get to the New York Times and that he had, you know, thought that I might be someone who would subpoena them.

Q: . . . . Alex Berenson told you that Dr. Egilman thought you would be someone who would help him, meaning Dr. Egilman, get the Zyprexa documents to the New York Times, right?

A: Well . . . . what I said was that he thought I was someone who might subpoena the documents.

Q: And so how – so Alex Berenson gives Dr. Egilman your name, correct, that's what he said?

A: That's what he said.

Q: Then Dr. Egilman calls you on November 28 and says I have some documents you might want to subpoena, right?

A: Did he say that exactly? I think that's the import of it.

Q: And did the two of you when you were talking on November 28 talk about this relationship you both had with Alex Berenson?

A: I may have mentioned that I tried to contact him before, that I might have tried to contact him before.

The Court: Him is who?

A: Mr. Berenson.

Q: Did you tell Dr. Egilman that you had spoken with Alex [Berenson] and that you understood that he had given Dr. Egilman your name?

A: Yes, I think at some point that was communicated one way or another.

. . . .

Q: . . . . But . . . you learned that [Dr. Egilman calling you] was not out of the blue, it was actually orchestrated by Dr. Egilman and Alex Berenson, right?

5

A: Well, I don't know how that is inconsistent with what I wrote in my letter. It was out of the blue.

Q: It was out of the blue for you, right?

A: Yes.

Q: But it was not out of the blue for Dr. Egilman or Alex Berenson?

. . . .

A: So I mean out of the blue — I mean — it seemed that — it's like I said, what Alex Berenson told me was that he had told Dr. Egilman that I might be someone who would subpoena the documents so I don't know where out of the blue comes into that.

. . . .

Q: After the conversation that you had with Dr. Egilman on November 28, you agreed to subpoena the documents, correct?

A: Yes. Well, to at least try to. To try and find a case to do that.

Q: Okay. And you continued to communicate with Alex Berenson prior to your receipt of the documents relating to the articles that he was planning or hoping to write about Zyprexa, correct?

A: Prior to?

Q: Yes.

A: There may have been some.

Tr. of Hr'g, 95-99 (January 17, 2007).

Lilly shall forthwith serve a copy of this invitation on Alex Berenson, together with all papers filed in the current proceedings to obtain an injunction, including the full transcript of the January 16-17, 2007 hearing. Copies of this order, but not the accompanying papers, shall be served by Lilly via fax, email, or mail on all attorneys who appeared at the January 16-17, 2007

6

hearing.

SO ORDERED.

Jack B. Weinstein

Date: January 29, 2007
Brooklyn, N.Y.