**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------x

IN RE ZYPREXA PRODUCTS
LIABILITY LITIGATION

<u>MEMORANDUM AND ORDER</u>

**04-MD-1596 (JBW)**

-------------------------------------------------------x

**ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:**

In 2006, the original Plaintiffs' Steering Committee ("PSC I") in this Multi-District

Litigation ("MDL") successfully settled a generic liability case against Eli Lilly and Co.

("defendant Lilly"), the manufacturer of the drug Zyprexa.[1]  In recognition of PSC I's

commendable skill and dedication in working on behalf of more than 8,000 individual

plaintiffs, this Court granted PSC I's application for $28,445,000 in attorneys' fees from the

common benefit fund created by the settlement.  <u>See</u> 12/29/06 Memorandum and Order

("12/29/06 M&O").  The Court subsequently awarded $250,000 in supplementary fees

inadvertently excluded from the initial fee application.  <u>See</u> 3/15/07 Memorandum and Order

("3/15/07 M&O").

Currently pending before this Court is PSC I's motion for $6,500,000 in additional

fees.  <u>See</u> <u>generally</u> 1/25/08 Motion By PSC I For an Award of Supplemental Common Benefit

Attorneys' Fees ("1/25/08 PSC I Mot.").  First, PSC I requests that this Court augment its

prior fee awards because several firms did not receive full compensation for their labors.

Second, PSC I seeks fees for four firms that have continued to contribute efforts on behalf of

all plaintiffs since submitting time sheets in connection with PSC I's initial fee application.

Finally, PSC I asks this Court to distribute, pro rata, any remaining common benefit funds set

_____

[1]  Familiarity with this Court's prior opinions is presumed.

aside for attorney fees to each PSC I member firm, as well as to two non-member firms.  For

the reasons set forth below, this Court grants in part and denies in part PSC I's motion.

## BACKGROUND

In 2004, the Honorable Jack B. Weinstein authorized the creation of PSC I to oversee

pre-trial efforts on behalf of all plaintiffs whose actions were consolidated into the first phase

of this litigation.  See 6/15/04 Case Management Order No. 1; 1/25/08 Affidavit of James M.

Shaughnessy, Esq. in Support of Motion By PSC I for an Award of Supplemental Common

Benefit Attorneys' Fees ("1/25/08 Shaughnessy Aff.") ¶ 1.[2]  PSC I's valuable efforts  during

the ensuing two years yielded a multi-million-dollar settlement.  See id. ¶ 2.[3]  In August 2006,

in order to ensure that the members of PSC I would be compensated for their efforts, Judge

Weinstein ordered that one percent of the gross settlement be set aside in an interest-bearing

account "for possible use as part of the common benefit fund to be allocated among the

members of [PSC I] for work performed, and expenses incurred, for the benefit of plaintiffs as

a group."  See 8/25/06 Order for Set Aside for the Common Benefit Fund for Members of the

Former Plaintiffs' Steering Committee ("8/25/06 Order").[4]  The order further stated, in a

handwritten insertion, that "[a]ny sums left after payment [of fees] will go back into the

---

[2]  At the time PSC I submitted the instant application, Shaughnessy was special counsel to
Milberg Weiss LLP, which subsequently changed its name to Milberg LLP ("Milberg").  See
3/24/08 Notice of Change of Law Firm Name.

[3]  The settlement also included an additional $10 million to cover administration expenses.  See
1/25/08 Shaughnessy Aff. ¶ 2.

[4]  The referenced date in each citation throughout this Memorandum and Order corresponds to
the date on which the document was entered into the Electronic Case Filing docketing system.

general escrow fund." See id. In a separate order, Judge Weinstein referred the PSC I fee

issue to the underlying magistrate. See 8/24/06 [Referral] Order.

Subsequently, on October 18, 2006, PSC I filed an application with this Court

seeking $28,445,000 in fees and $2,591,583.87 in disbursements (hereinafter, "PSC I's initial

application"). See generally 10/18/06 The Original PSC's Motion for an Order Awarding

Attorneys' Fees and Reimbursement of Expenses. PSC I proposed these amounts after a PSC I

committee reviewed each individual firm's calculation of its hourly rates multiplied by the

number of hours spent on the case. See Affidavit of Melvin Weiss, Esq. in Support of the

Original PSC's Motion for an Award of Attorneys' Fees and Reimbursements of Expenses

("Weiss Aff.") ¶ 15. The PSC I committee also examined the firms' underlying time sheets.

See id. ¶ 15. In some instances, the PSC I committee recommended that certain firms receive

less compensation than requested by those firms. Compare 10/9/06 Memorandum [Regarding

Firm-By-Firm Summary of Fees and Expenses] ("Firm-By-Firm Fee Summary") (attached as

Ex. B to Weiss Aff.) with 10/10/06 Original PSC Allocation Committee Revised Final

Recommendations ("PSC I Committee Recommendations") (attached as Ex. C to Weiss Aff.).

The committee also recommended that fees for some firms be enhanced by a multiplier, but

declined to do so for others. See id. After considering the PSC I committee

recommendations, as well as reviewing the underlying documentary support, this Court issued

a memorandum and order granting PSC I's fee application in toto. See 12/29/06 M&O.

Shortly thereafter, PSC I moved for $250,000 in supplementary fees. See 2/12/07 The

Original PSC's Motion for a Supplementary Award of Attorneys' Fees. PSC I informed the

Court that, in making its prior fee application, it had inadvertently miscalculated the total fees.

3

See id. ¶ 6.  On March 15, 2007, this Court approved the $250,000 supplemental fee award.
See 3/15/07 M&O.

Almost a year later, on January 25, 2008,  PSC I submitted the instant application for
$6,500,000 in supplemental fees.[5]  See 1/25/08 PSC I Mot.  First, PSC I seeks additional fees
for firms that were "not fully compensated" under the Court's prior fee awards.  See
Memorandum of Law in Support of Motion by PSC I for an Award of Supplemental Common
Benefit Attorneys' Fees ("PSC I Mem.") at 9.  Second, PSC I requests that the Court grant
fees to the four firms that have contributed work for common benefit issues arising during the
settlement allocation process since PSC I's initial application.  See id.  Finally, PSC I asks this
Court to distribute, pro rata, the balance of the one percent set-aside to the PSC I member
firms and two non-member firms working in conjunction with PSC I.  See id. at 4.

As of April 14, 2008, the balance of the common fund's one-percent set aside for
attorney's fees, including accrued interest, totaled in excess of $8 million.  4/14/08 Telephone
Conversation with Christopher A. Seeger, Esq.

## DISCUSSION

**I.      Modification of Prior Fee Awards**

Eleven firms that were compensated under this Court's 12/29/06 M&O and 3/15/07

---

[5]  PSC I initially submitted a fee application on October 17, 2007, along with time sheets for
four firms ("2007 Time Sheets"), but withdrew that motion on November 13, 2007.  See
11/13/07 [Letter Withdrawing Motion of PSC I].  When PSC I re-submitted the instant motion
on January 25, 2008, it incorporated by reference the 2007 Time Sheets, already in possession
of the Court.  See PSC I Mem. at 3 n.2.

M&O for their efforts up until PSC I's initial application now ask this Court to increase its

prior awards.[6]  Apparently, the fees sought by these firms do not relate to any additional work

or efforts made on behalf of all plaintiffs since PSC I's initial application.  PSC I has submitted

no time sheets showing that these firms have incurred additional hours, nor does PSC I allege

in its motion papers that these firms have expended further hours on common benefit matters.[7]

The only argument PSC I advances for granting these additional fees is that these firms were

"not fully compensated" under the prior awards.  <u>See</u> PSC I Mem. at 2.  PSC I submits no

other justification or explanation for awarding these firms supplementary fees.

    As an initial matter, this request is untimely.  Counsel had until January 12, 2007 to

---

[6]  These firms are Ashcraft & Gerel LLP; The Beasley Firm; Fibich, Hampton & Leebron, LLP; Hersh & Hersh; Levin Papantonio Thomas Mitchell Echsner & Proctor, P.A.; Lopez, Hodes, Restaino, Milman & Skikos P.C.; Robinson, Calcagnie & Robinson, Inc.; Parker Waichman Alonso LLP; Richardson, Patrick, Westbrook & Brickman, LLC; Weitz & Luxenberg, P.C.; and Whatley Drake & Kallas, LLC.  <u>See</u> PSC I Mem. at 3-4.

[7]  At one point in its papers, PSC I vaguely states that, after the PSC I fee committee had received and reviewed the 2007 Time Sheets, it "obtained additional submissions from member firms."  <u>See</u> PSC I Mem. at 5-6.  Notably, PSC I does not identify these firms or specify whether these additional submissions related to continuing work, nor does PSC I include any such submissions in its pending application.  <u>See</u> PSC I Mem. at 6 (explaining that the additional submissions are in the possession of Steven J. Skikos of Lopez, Hodes, Restaino, Milman & Skikos P.C.).  It is clear that not all firms incurred additional hours.  <u>See</u> <u>id.</u> at 5 (noting that "certain firms" performed services following PSC I's initial application); <u>id.</u> at 9 (firms currently seeking fees "either continued to work . . . *or* were not fully compensated under [the Court's prior fee awards]") (emphasis added).  Nevertheless, even assuming that some of the "additional submissions" to which PSC I alludes related to continued work, the Court is not required to award fees when firms fail to furnish it with contemporaneous time records.  <u>See, e.g.,</u> <u>New York State Ass'n for Retarded Children, Inc. v. Carey</u>, 711 F.2d 1136, 1147 (2d Cir. 1983) ("[C]ontemporaneous time records are a prerequisite for attorney's fees in this Circuit."); <u>Cho v. Koam Med. Servs., P.C.</u>, 524 F.Supp.2d 202, 209 (E.D.N.Y. 2007).

file objections to the 12/29/06 M&O, but none was ever filed.  See 12/29/06 M&O at 16.  A

few months later, this Court granted PSC I's supplementary fee request based on PSC I's

$250,000 arithmetic error, see 3/15/07 M&O at 4, and no objection thereto was filed by the

March 29, 2007 deadline, or any time thereafter.  The lack of an objection is not surprising,

because the Court awarded *exactly what PSC I had requested*, including PSC I's proposed

enhancements and reductions. See Weiss Aff. ¶ 15; see also Fears v. Wilhelmina Model

Agency, Inc., No. 02 Civ. 4911 (HB), 2007 WL 1944343, at *5 (S.D.N.Y. July 5, 2007)

(noting that a negative multiplier "is not out of the ordinary in common fund cases").  PSC I's

recommendations were consistent with its previous representations to Judge Weinstein that not

all firms would receive the full amount of their requested fees.  See 7/24/06 Partial Transcript

of Order to Show Cause at 37 ("7/24/06 Tr."), attached to 8/24/2006 Letter by James M.

Shaughnessy, Esq. (in response to Judge Weinstein's query whether firms would accept less

than their "lodestar" calculations, the then chairman of PSC I stated that "[s]ome will and

some won't").  This Court gave substantial weight to the committee's recommendations in

making its prior fee awards.  See 12/29/06 M&O at 14.  The Court discerns no reason – nor

does PSC I proffer one – for concluding, one year later, that these firms actually deserved

additional compensation for the same work.

For instance, Parker Waichman Alonso LLP ("Parker Waichman") originally submitted

a fee request for $808,475.  See Firm-By-Firm Fee Summary at 2.  The PSC I fee committee

recommended that Parker Waichman be awarded $800,000, a reduction of $8,475, and this

Court adopted that proposal.  See PSC I Committee Recommendation; see generally 12/29/06

M&O.  In the current motion, the committee now recommends, without explanation, that

Parker Waichman receive an additional $120,000.  See 1/25/08 Shaughnessy Aff. ¶ 5.

Another firm, Richardson, Patrick, Westbrook & Brickman, LLC ("Richardson Patrick"),

requested approximately $1.49 million in fees, and the committee recommended $1.75 million

– an enhancement of $260,000, which the Court approved.  See Firm-By-Firm Fee Summary

at 2; PSC I Committee Recommendation; 12/29/06 M&O.  PSC I now requests -- again

without explanation -- that Richardson Patrick be awarded an additional $315,000.  See

1/25/08 Shaughnessy Aff. ¶ 5.

      To be sure, an enhancement of fees is appropriate in certain cases, and this Court did

grant modest multipliers to a few PSC I firms based, in large part, on the committee's

recommendations.  The opportunity, however, to request enhancements – or indeed to

challenge the reasonableness of the Court's allocation of fees – has long since passed.  This

Court rejects PSC I's revisionist approach to determining what is a reasonable fee.  See In re

Painewebber Ltd. P'ships Litig., No. 94 Civ. 8547(SHS), 2003 WL 21787410, at *7

(S.D.N.Y. Aug. 4, 2003) (deeming firm's post-settlement fee application to be untimely

because almost all hours billed related to pre-settlement work, which had already been

addressed in a previous fee award).  To do otherwise would fly in the face of the Court's duty

to maintain "a jealous regard to the rights of those who are interested in the fund."  See

Goldberger v. Integrated Res., Inc., 209 F.3d 43, 53 (2d Cir. 2000) (internal quotations and

citations omitted).[8]  Accordingly, the Court denies PSC I's request for supplementary fees for

_____

[8]  PSC I's suggestion that granting its application would have no financial impact on the
claimants (see PSC I Mem. at 4; 1/25/08 Shaughnessy Aff.¶ 8) is belied by the language of
Judge Weinstein's order setting aside one percent of the gross settlement and expressly

(continued...)

those firms that did not perform work subsequent to PSC I's initial application.

## II. Fees for Work Subsequent to PSC I's Initial Application

PSC I also seeks fees for four firms that continued to bill hours on behalf of all plaintiffs after PSC I submitted its initial application.[9] PSC I recommends that each of these four firms receive an enhancement of their fees by use of a multiplier.

### A. Legal Standard

Courts maintain the equitable power to ensure that lead or liaison counsel procure reasonable compensation for efforts made in creating a common benefit fund, and such compensation may derive directly from the fund. See, e.g., Goldberger, 209 F.3d at 47 (citing Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980)). Further, a Court may award "supplemental fees to counsel for work performed in relation to the litigation or settlement following counsel's initial fee application." Fears, 2007 WL 1944343, at *6 (citations omitted).

Courts have utilized two different methods to calculate the amount of a fee award from a common benefit fund. Pursuant to the "percentage of the fund" method, the Court sets as the fee some percentage of the common benefit fund. See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 121 (2d Cir. 2005); Goldberger, 209 F.3d at 47, 50; Savoie v.

---

[8](...continued)
providing that any balance remaining after payment of fees would "go back into the general escrow fund." 8/25/06 Order.

[9] These four firms are: Burg Simpson Eldredge Hersh & Jardine, P.C. ("Burg Simpson"); Douglas & London, P.C. ("Douglas & London"); Milberg; and Seeger Weiss, LLP ("Seeger Weiss").

Merchants Bank, 166 F.3d 456, 460 (2d Cir. 1999); see also Blum v. Stenson, 465 U.S. 886, 900 n.16 (1984) (noting that, "under the 'common fund doctrine,' . . . a reasonable fee is based on a percentage of the fund bestowed on the class."). Alternatively, a court may calculate the "presumptively reasonable fee" (formerly known as the "lodestar method"), whereby the court multiplies what it determines to be a reasonable hourly rate by the number of hours reasonably expended on behalf of all plaintiffs. See Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, – F.3d – , 2008 WL 961313, at *7 (2d Cir. 2008); see also Wal-Mart, 396 F.3d at 121, 123 n.27; Goldberger, 209 F.3d at 47. "The reasonable hourly rate is the rate a paying client would be willing to pay, . . . bear[ing] in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." Arbor Hill, 2008 WL 961313, at *7.

Regardless of which method is used, "the fees awarded in common fund cases may not exceed what is 'reasonable' under the circumstances." Goldberger, 209 F.3d at 47; accord Wal-Mart, 396 F.3d at 121; SEC v. Goren, 272 F.Supp.2d 202, 206 (E.D.N.Y. 2003). Under either approach, in exercising its sound discretion, the Court should look to a number of traditional factors in determining a reasonable common fund fee. See Goldberger, 209 F.3d at 47, 50; see Arbor Hill, 2008 WL 961313, at *4 n.3, *7. Those criteria include the following:

(1)  the time and labor expended by counsel;
(2)  the magnitude and complexities of the litigation;
(3)  the risk of the litigation . . . ;
(4)  the quality of representation;
(5)  the requested fee in relation to the settlement; and
(6)  public policy considerations.

Wal-Mart, 396 F.3d at 121–22 (citing Goldberger, 209 F.3d at 50); see Arbor Hill, 2008 WL

9

961313 at *4 n.3 (listing factors enumerated in <u>Johnson v. Georgia Highway Express, Inc.</u>, 488 F.2d 714 (5th Cir. 1974), <u>abrogated on other grounds by Blanchard v. Bergeron</u>, 499 U.S. 87, 92-93, 96 (1989)); <u>Silberblatt v. Morgan Stanley</u>, 524 F.Supp.2d 425, 434-35 (S.D.N.Y. 2007).

## B.  Request For Additional Multipliers

Four firms collectively seek $3,764,555 for work performed between May 2006 and August 2007,[10] since PSC I's initial application.  While some firms addressed substantive issues relating to settlement such as medical liens and attorney fee applications, the majority of this work involved the allocation of the settlement funds.  <u>See</u> PSC I Mem. at 2.  The request

---

[10]  PSC I originally sought $3.8 million for the four firms for this time period, but reduced the request after the Court, in initially reviewing the 2007 Time Sheets, discovered several time entries that appeared to relate to efforts by the revised Plaintiffs' Steering Committee ("PSC II"), in connection with the second phase of the <u>In re Zyprexa</u> litigation.  <u>See</u> 2/27/08 Order. The Court ordered that time entries for any PSC II work be removed from the current application, which is limited to PSC I's efforts.  <u>See</u> <u>id.</u> (citing examples); <u>see</u> <u>also</u> 1/25/08 Shaughnessy Aff. ¶ 1 n.1.

On February 29, 2008, Milberg submitted an affidavit in which it suggested that the Court had misinterpreted the time entries referencing a motion to establish a "common benefit fund," which, according to Milberg, referred to PSC I's initial fee application docketed on October 18, 2006, and not to PSC II.  <u>See</u> 2/29/08 Affidavit of James M. Shaughnessy, Esq. In Response to Order of February 27, 2008 ("2/29/08 Shaughnessy Aff.") ¶¶ 2-3; <u>but</u> <u>see</u> 9/12/06 Entry for James M. Shaughnessy submitted with 2007 Time Sheets ("Continued editing of motion papers for creation of a common benefit fund, <em>and</em> motion papers in support of fee application") (emphasis added); 9/27/06 Entry for James M. Shaughnessy submitted with 2007 Time Sheets ("Continued work on motion to approve fees and disbursements <em>and</em> motion to es[t]ablish a common benefit fund . . . .") (emphasis added); <u>see</u> <u>also</u> 10/5/06 Motion for an Order Establishing a Common Benefit Fund (filed by PSC II thirteen days before PSC I filed its initial fee application).  Nevertheless, Milberg agreed to remove select time entries, which reduced its fee request by $35,445.  <u>See</u> 2/29/08 Shaughnessy Aff. ¶ 3 (noting that revised time sheets reflected that "a number of additional entries [had been] eliminated"); <u>see</u> <u>also</u> [Milberg Revised Time Records] (attached as Ex. B to 2/29/08 Shaughnessy Aff.).

for an additional $3,764,555 in fees represents the four firms' combined actual time charges plus substantial enhancements, see PSC I Mem. at 3-5, which range from multipliers of 3.2 to 4.93.[11]

As an initial matter, the Court concludes that no multipliers are appropriate for the requested fees. Courts in their discretion may adjust fees in recognition of, *inter alia*, the risk of non-payment, complexity of the issues and quality of representation. See Hensley v. Eckerhart, 461 U.S. 424, 433-37 (1983); Goldberger, 209 F.3d at 47. "As the chance for success on the merits or by settlement increases, the justification for using a risk multiplier decreases." In re "Agent Orange" Prod. Liab. Litig., 818 F.2d 226, 236 (2d Cir. 1987) (citation omitted).

PSC I member firms assumed a modicum of risk, if any at all, in continuing to work on behalf of all plaintiffs. See generally Goldberger, 209 F.3d at 54 ("We have historically labeled the risk of success as perhaps the foremost factor to be considered in determining whether to award an enhancement.") (internal quotation and citations omitted); In re Veeco

---

[11] In characterizing the requested multipliers as ranging from 1.00 to 1.79, see PSC I Mem. at 6, PSC I takes into account each firm's lodestar over the course of the entire litigation, rather than limiting its focus to the time charges during the settlement allocation phase of the litigation. For example, PSC I observes that if the current application is granted *and* combined with the Court's previous awards under the 12/29/06 M&O and 3/15/07 M&O, then "Burg Simpson will have been paid 1.44 times its time charges[.]" See PSC I Mem. at 6. In fact, Burg Simpson, which was previously granted a 1.25 multiplier based in part on PSI's recommendation, see 10/18/06 Original PSC's Memorandum of Law in Support of its Motions for an Award of Attorneys' Fees and Reimbursement of Expenses at 16-17, now seeks a multiplier of *4.93* for its more recent time charges.

PSC I's calculation of the multipliers as percentages of each firm's time charges throughout the litigation assumes that this Court is prepared to revise the multipliers already granted in its previous awards. For the reasons discussed above, this assumption is wrong.

Instruments Inc. Secs. Litig., No. 05 MDL 1695 (CM), 2007 WL 4115808, at *9 (S.D.N.Y.

Nov. 7, 2007).  In September 2005, the PSC I member firms and defendant Lilly executed a

settlement agreement.  See 9/21/05 Letter by Nina M. Gussack, Esq. (confirming the

execution of the settlement agreement).  By May 2006, PSC I reported to the Court that nearly

99.6 percent of the affected plaintiffs had accepted the settlement terms, far surpassing the 90

percent defendant Lilly required for the settlement to take effect.[12]  See 5/24/06 Letter by

Christopher A. Seeger, Esq.  On July 24, 2006, PSC I learned that Judge Weinstein was

amenable to setting aside one percent of the settlement award from which to compensate PSC I

for its work.  See 7/24/06 Tr. at 36-38.  Thus, during the time period for which PSC I seeks

compensation, PSC I knew that there was a binding settlement agreement and that the firms

would be paid going forward.

Additionally, a substantial portion of the tasks undertaken during that period involved

the routine administration of the settlement.[13]  See City of Detroit v. Grinnell Corp., 560 F.2d

1093, 1100 (2d Cir. 1977) ("And while someone must spend long hours processing consumer

---

[12]  Although nearly all plaintiffs signed their settlement releases by May 2006, a large portion of the plaintiffs had yet to have their settlements approved due to the fact that some individual attorneys had delayed the process by submitting insufficient supporting documents.  See Transcript of June 1, 2006 Hearing ("6/1/06 Tr.") at 9-15.  However, at a June 1, 2006 hearing with PSC I members in attendance, Special Master Kenneth R. Feinberg told Judge Weinstein that he was "confident that by August 1st, [2006,] . . . we would be able to meet the statistical trigger set up by the agreement."  See 6/1/06 Tr. at 15.

[13]  While the large number of settling plaintiffs necessarily prolonged the allocation of the settlement funds, the complex issue of how much each plaintiff would receive was resolved by the Special Masters, who then conveyed that information to the law firm of Seeger Weiss, which effectuated the payment.  2/14/08 Telephone Conversation with Special Master Michael K. Rozen.

claims, it is widely recognized that it is not work requiring any great amount of professional skill.") (internal quotation and citation omitted), abrogated in part by Goldberger, 209 F.3d 43 at 50; In re AOL Time Warner ERISA Litig., No. 02 Civ. 8853 (SWK), 2007 WL 3145111, at *1 (S.D.N.Y. Oct. 26, 2007) (noting that tiered fee award recommended by Special Master "reflects the varying degrees of risk and complexity inherent in different stages of the litigation").

Finally, this Court's refusal to award additional multipliers at this stage is unlikely to reduce counsels' strong incentive to bring common fund cases that serve the public interest. See Goldberger, 209 F.3d at 51. Indeed, in addition to the compensation the four firms have already received and will receive for their work with PSC I, three of those firms derived substantial fees from representing individual clients who settled their claims in the first phase of the litigation: Burg Simpson, Douglas & London, and Seeger Weiss earned $23.5 million, $21.9 million and $78.5 million, respectively.[14]  3/26/08 Telephone Conversation with Special Master Michael K. Rozen. And the fourth firm (Milberg) presumably will receive fees for its work on PSC II. See 8/21/06 Order (Amended Case Management Order No. 19) (naming Milberg partners as Chairman and Plaintiff's Liaison Counsel for PSC II).

Accordingly, this Court denies PSC I's request for enhancement of the four firms' fees. See In re Painewebber, 2003 WL 21787410, at *2 (declining to award multiplier for work relating to settlement allocation phase of class action even though the court had previously

---

[14]  That these firms have been amply compensated is further underscored by the fact that there appears to be a slight overlap in time charges between the PSC I initial application and the instant application.  See, e.g., Burg Simpson Time Records, Entries for 6/15/06 through 6/22/06, which were included in the lodestar calculation relied upon in this Court's 12/29/06 M&O.

awarded a 1.4 multiplier for pre-settlement work); <u>In re "Agent Orange" Prod. Liab. Litig.</u>, 611 F.Supp. 1296, 1314 (E.D.N.Y. 1985) (Weinstein, J.) ("A quality multiplier need not be granted for all counsel or for all tasks."), <u>rev'd in part on other grounds</u>, 818 F.2d 226; <u>see</u> <u>id.</u> at 1351-52 (refusing to award discretionary multiplier for post-settlement tasks); <u>cf.</u> <u>Cho</u>, 524 F.Supp.2d at 207 (noting that a firm's rates can vary depending on the type of legal work involved).

### C. Calculation of Fees

Turning to the calculated fees of each individual firm, the Court recognizes that in granting its previous awards, it analyzed the reasonableness of the requested fees by utilizing the simpler percentage method, with which the Court then compared the lodestar calculation as a touchstone. <u>See</u> 12/29/06 M&O at 8-15. Nevertheless, given PSC I's attempts to increase its prior fee awards under the guise of a new application, the Court finds it appropriate to undertake a more searching examination of the individual firms' time sheets, rather than rely on the hourly calculations as a simple cross-check of a percentage method calculation. <u>See</u> <u>Goldberger</u>, 209 F.3d at 52-53, 57 (emphasizing the importance of moderation in awarding attorney fees in the context of common benefit funds).

#### i. Burg Simpson

Burg Simpson requests $202,985 in fees for work completed between June 15, 2006 and May 3, 2007. <u>See</u> 2/12/08 Affidavit of Seth A. Katz in Support of Burg Simpson Eldredge Hersh & Jardine, P.C.'s Supplemental Common Benefit Distribution ("2/12/08 Katz Aff.") ¶ 2; [Burg Simpson Time Records] at 1 (attached as Ex. A to 2/12/08 Katz Aff.). Specifically, seven Burg Simpson shareholders billed a total of 277.7 hours at hourly rates of

$550 to $650, two associates billed 3.8 hours at hourly rates of $350 to $400, and one paralegal billed 256 hours at $150 per hour. See id. Since PSC I's initial application, Burg Simpson continued its work on, *inter alia*, the effect of medical liens on plaintiffs' settlements. See, e.g., 7/20/06 Entry for Seth A. Katz; 7/24/06 Entry for Seth A. Katz; 8/08/06 Entry for Michael S. Burg. During this time, Burg Simpson also continued to manage the document depository, as well as arranged for its transfer to South Carolina, where PSC II now maintains the depository on behalf of the second phase of the *Zyprexa* litigation. See 2/12/08 Katz Aff. ¶ 3j; see also 7/28/06 Entry for Peter W. Berg; 7/24/06 Entry for Matthew S. McElhiney.

In most instances, Burg Simpson's time sheets are sufficiently detailed to enable the Court to determine the reasonableness of the fees being sought. One exception consists of the time entries for Kerry N. Jardine ("Jardine"), a shareholder with more than twenty years' experience. See 2/12/08 Katz Aff. ¶ 3c. Of the 31.30 hours Jardine contributed to the case, 23.8 hours were devoted to "Receipt and Reviewing of Emails." See, e.g., 10/23/06 Entry for Kerry N. Jardine; 10/25/06 Entry for Kerry N. Jardine; 10/26/06 Entry for Kerry N. Jardine. The notations fail to indicate what e-mails Jardine reviewed or how the e-mails relate to the *Zyprexa* litigation. See id. At an hourly billing rate of $600, Jardine seeks $13,740 in fees for reading e-mails that may or may not concern the work of PSC I on behalf of all plaintiffs. It is impossible for this Court to determine the reasonableness of these vague time entries. See, e.g., Cho, 524 F.Supp.2d at 209 (reducing fees because vague entries were "not sufficiently specific to permit the Court to determine whether the attorneys spent their time on reasonably necessary tasks much less efficiently"); Krasnyi Oktyabr, Inc. v. Royal Sweet Bakery, Inc., 05-CV-3021 (DGT), 2007 WL 2815808, at *8 (E.D.N.Y. Sept. 25, 2007) (reducing fees in

half due to vague description).

Another issue that gives this Court pause is the fact that three shareholders – Michael S. Burg, Peter W. Burg, and Seth A. Katz – often billed for the same task. <u>See, e.g.</u>, 8/18/06 Entry for Peter W. Burg ("Analyze common benefit record of all firms"); 8/18/06 Entry for Michael S. Burg (same); 8/16/06 Entry for Seth A. Katz (same); 12/18/06 Entry for Peter W. Burg ("Telephone Call re: Special Master Payment"); 12/18/06 Entry for Michael S. Burg (same); 12/18/06 Entry for Seth A. Katz (same). These three shareholders frequently billed for their individual participation in the same conference with PSC I members. <u>See, e.g.</u>, 6/23/06 Entry for Michael S. Burg (PSC I telephone conference); 6/23/06 Entry for Peter W. Burg (same); 6/23/06 Entry for Seth A. Katz (same); 1/3/07 Entry for Michael S. Burg ("Telephone Conference Re: Finalization of Common Benefit Order"); 1/3/07 Entry for Peter W. Burg (same); 1/3/07 Entry for Seth A. Katz (same). In those instances in which Simpson Burg limited its participation in a PSC I conference to solely one shareholder, that shareholder billed for the conference, and then also billed for the time spent conferring with other shareholders, presumably to relay the events of the conference. The shareholders receiving the status update also billed for the time spent conferring on the issue. <u>See, e.g.</u>, 8/25/06 Entry for Seth A. Katz ("Telephone Conference with S. Skikos re: Track A. Default . . . Confer with MSB re: Same"); 8/25/06 Entry for Michael S. Burg ("Confer with SAK And PWB Re: Status & Track A Claims"); 8/25/06 Entry for Peter W. Burg ("Confer W/ MSB & SAK RE: Trac[k] A Claim Issue"). While it is not unusual for a firm to assign multiple lawyers to a complex litigation, <u>see</u> <u>Cho</u>, 524 F.Supp.2d at 210 (noting significant overlaps can occur in "larger litigation"), the Court believes that in this phase of the litigation, a reasonable paying client would find

such duplicative practices excessive.  See Hensley, 461 U.S. at 434 ("Counsel for the

prevailing party should make a good faith effort to exclude from a fee request hours that are

excessive, redundant, or otherwise unnecessary . . . ."); Goren, 272 F.Supp.2d. at 209

(finding excessive billing when "hours were apparently billed just to communications amongst

the professionals"). There is no reason why two law partners, or even one, would not have

sufficed.  See Goldberger, 209 F.3d at 57 (noting the Second Circuit's "longstanding concern

for moderation" in awarding common benefit attorney fees).

Additionally, the Court excludes the 3.8 hours for which associates Daniel R. Coombe

("Coombe") and Max Yefimenko ("Yefimenko") billed.  Coombe, a first-year associate during

the relevant time period, spent a total of 2.8 hours on the case: 0.4 hour reviewing an order by

Judge Weinstein, one hour meeting with two Burg Simpson shareholders, 0.7 hour

"review[ing] [] lien information," and 0.7 hour making calls to clients and "case review."[15]

See, e.g., 10/02/06 Entry for Daniel R. Coombe.  Yefimenko spent one hour on the case: 0.5

hour for "Documentation Received . . ." and 0.5 hour reviewing an order of Judge Weinstein

– the same order that Coombes reviewed, as well as two shareholders.  See 8/16/06 Entry for

Daniel R. Coombe; 8/16/06 Entry for Max Yefimenko; 8/16/06 Entry for Peter W. Burg;

8/17/06 Entry for Seth A. Katz (reviewing "8/16/06 Order").  In light of the numerous

shareholders assigned to the case, the Court is not persuaded that billing a client for two

associates' *de minimis* contributions represents "the minimum necessary to litigate the case

---

[15] Burg Simpson's overstaffing is highlighted by the fact that Coombes billed for reviewing the
case, more than two years into the litigation.  Further, it is doubtful that calling Burg
Simpson's clients can truly be said to be undertaken on behalf of all plaintiffs.

effectively." <u>See Arbor Hill</u>, 2008 WL 961313 at *7.

Finally, Burg Simpson offers no evidence regarding the experience or training of its paralegal Kathryn A. Gann ("Gann"), despite the Court's February 11, 2008 Order requesting such information. <u>See</u> Katz Aff. ¶ 3j; Burg Simpson Time Records; 2/11/08 Order. Gann billed 256 hours at an hourly rate of $150. <u>See</u> Katz Aff. ¶ 3j. Paralegal rates, however, vary based on experience. <u>Cf</u>. <u>Comm'n Express Nat'l, Inc. v. Rikhy</u>, 03-CV-4050 (CPS), 2006 WL 385323, at * 6 (E.D.N.Y. Feb. 17, 2006) (reciting paralegals' professional biographies before determining that the rates being sought should be reduced to $75 per hour). Because Burg Simpson failed in its burden, the Court will award an hourly rate near the lower end of the paralegal market, or $75 an hour.

Accordingly, the Court deducts $1,380 for the associates' contribution to the case and reduces Gann's hourly rate to $75, which results in a total of $182,405. The Court further decreases this sum by 30 percent – or, $54,721.50 – for the overstaffing concerns and excessive vague time entries outlined above. <u>See</u> <u>Kirsch v. Fleet Street, Ltd.</u>, 148 F.3d 149, 173 (2d Cir. 1998) (courts may reduce excessive or redundant hours by "simply [] deduct[ing] a reasonable percentage") (citing <u>Carey</u>, 711 F.2d at 1146); <u>In re Painewebber</u>, 2003 WL 21787410, at *5 (reducing fee by percentage for vague time entries such as "Review memos"). Therefore, the Court awards Burg Simpson $127,683.50 in fees.

### ii. Douglas & London

Douglas & London requests $62,146 in fees for work completed between May 30, 2006 and June 18, 2007. <u>See generally</u> [London & Douglas Time Sheets] (attached to 9/12/07 Letter from Michael A. London Esq.). Specifically, one partner billed 137 hours at $450 per

hour and one paralegal billed 12.4 hours at $40 per hour. See id. Douglas & London billed for tasks relating to medical liens, see, e.g., 7/7/06 Entry for Michael A. London, as well as for various duties connected with Michael A. London's position as Vice Chair of PSC I. See 2/13/08 Affidavit of Michael A. London, Esq. ¶ 3.

Taking into consideration the factors set out in *Arbor Hill* and *Goldberger*, the Court finds both the time spent by Michael A. London (137 hours) and the rate charged ($450) to be reasonable. The modest $40 hourly rate for 12.4 hours contributed by one Douglas & London paralegal is similarly within reason. Thus, the Court awards Douglas & London fees amounting to $62,146.

### iii. Milberg

Milberg requests $243,402.50 in fees for work completed between July 5, 2006 and August 15, 2007. See [Milberg Revised Time Records]. In total, twelve persons contributed 478.75 hours on behalf of all plaintiffs in the first phase of the litigation: one partner (at an hourly rate of $925), one special counsel ($625), one associate ($370), five paralegals ($225 to $235), one summer law clerk ($215), two document clerks ($230 to $240), and one litigation support clerk ($240). Milberg devoted several hours to drafting PSC I's initial application for fees. See, e.g., 9/8/06 Entry for Tomasita Sherer; 9/11/06 Entry for James M. Shaughnessy. Additionally, founding partner Melvin I. Weiss ("Weiss") served as Chair of PSC I,[16] while special counsel James M. Shaughnessy ("Shaughnessy") has held the position of Plaintiffs' Liaison Counsel since August 21, 2006. See 8/21/06 Order (Amended Case Management

---

[16] As of March 21, 2008, Weiss resigned from all PSC I committees. See 3/24/08 Order.

Order No. 19).  As such, both attorneys dedicated many hours to telephone conferences and meetings with other PSC I members.[17]  See, e.g., 9/01/06 Entry for James M. Shaughnessy; 9/18/06 Entry for Melvin I. Weiss.

Milberg's records, for the most part, are detailed, save for several vague entries by Weiss:  of the twenty-five hours Weiss spent on PSC I activities, 12.5 are allocated to "[r]eview[ing] various emails, correspondence, [and] documents."  See, e.g., 8/22/06 Entry for Melvin I. Weiss.  As noted above, these types of entries lack sufficient detail to enable the Court to determine their reasonableness.

Further, even accepting the extremely generous hourly rates requested for Milberg's legal staff, the Court rejects those sought for the firm's non-attorney professionals.  For instance, Milberg seeks a range of $225 to $235 per hour for four paralegals with less than five years' experience and $235 an hour for Katherine Yi, a paralegal with just under six years' experience.  See Affidavit of James M. Shaughnessy, Esq., In Response to Order of February 11, 2008 ("2/11/08 Shaughnessy Aff.") ¶¶ 8-11.  These rates far surpass what federal courts in Brooklyn have deemed to be a reasonable paralegal rate.  See Coated Fabrics Co. v. Mirle Corp., 06-CV-5415 (SJ), 2008 WL 163598, at *8 (E.D.N.Y. Jan. 16, 2008) (reducing $125 billing rate for paralegals with eight to twelve years' experience to $75); Cho, 524 F.Supp.2d at 207 (noting that recent EDNY cases approved $70 to $80 for legal assistants); Staples, Inc.

_____

[17]  In contrast to Burg Simpson's billing practices, Milberg billed only one attorney's time for certain telephone conferences, even though at least two participated in the call.  See, e.g., 9/20/06 Entry for Melvin I. Weiss ("Participate in conference call w/ Jim Shaughnessy, co-counsel") (no corresponding entry for James M. Shaughnessy); 9/27/06 Entry for Melvin I. Weiss (billing for PSC I conference call including James M. Shaughnessy) (no corresponding entry for James M. Shaughnessy).

v. W.J.R. Assoc., 04-CV-904 (SJ) (KAM), 2007 WL 2572175, at *5 (E.D.N.Y. Sept. 4, 2007) (reducing requested paralegal rate of $125 to $75); Goren, 272 F.Supp.2d at 208 (deeming $50 to be reasonable legal paraprofessional rate). Thus, the Court reduces the hourly rates of Milberg's five paralegals to $75 per hour.[18]

Milberg further submits that an hourly rate of $215 is appropriate for summer law clerk Andrew Finkelstein. See 2/11/08 Shaughnessy Aff. ¶ 16. Finkelstein, who at the time was an undergraduate at the State University of New York at Albany, contributed four hours of mere data entry, which is more akin to clerical or even secretarial tasks. Therefore, this Court reduces his rate to $50 an hour. See, e.g., Levy v. Powell, 00-CV-4499 (SJF), 2005 WL 1719972, at *9 (E.D.N.Y. July 22, 2005) (clerical work compensable at $50 an hour). Additionally, the Court reduces the hourly rate of Milberg's two document clerks from $240 and $230 to $50, for updating a calendar and hand delivering documents to the Court. See, e.g., 7/20/06 Entry for Frantz Michaud; 2/12/07 Entry for Ray Velazquez.

Finally, Milberg billed in fifteen-minute increments rather than the standard six-minute increments. Although fifteen-minute increments are not unreasonable per se, see Corbett v. Guardian Worldwide Moving Co., 164 F.R.D. 323, 330 (E.D.N.Y. 1995), Milberg's time sheets are necessarily less precise than they could be, and may be reduced on that basis. See La Barbera v. Pass 1234 Trucking, Inc., 04-CV-1364 (SJ) (MDG), 2007 WL 2908175, at *7

---

[18] The Court similarly reduces to $75 the hourly rate for Litigation Support employee James Kim ("Kim"). See Fabri v. United Technologies Int'l, Inc., 387 F.3d 109, 127 (2d Cir. 2004) (finding district court had discretion to reduce litigation support rates to $40 an hour). Kim's time sheet entries do not indicate what tasks he performed, but the surrounding context of nearby entries suggests that he helped coordinate document databases. See 9/19/06 Entry for James Kim (providing no description of task); 9/19/06 Entry for James M. Shaughnessy (meeting with "James Kim re: concordance [] of database").

(E.D.N.Y. Sept. 28, 2007) (reducing hours billed by fifteen percent where method of billing was "not entirely accurate since [attorneys'] time is divided into fifteen minute increments instead of the more traditional six minutes.").

Accordingly, this Court reduces Milberg's paralegal and litigation support rates to $75 per hour and the document clerk and summer law clerk rates to $50 per hour. Additionally, the Court subtracts three hours of work performed by paralegal Melissa McCarthy on October 5, 2006, as those tasks were for the benefit of PSC II. The revised fee total of $219,170 is further reduced by fifteen percent – or, $32,875.50 – for the vague time entries and the fifteen-minute increment billing practice addressed above. Therefore, Milberg is awarded $186,294.50 in fees.

### iv. Seeger Weiss

Seeger Weiss LLP seeks $418,480.50 in fees for work completed between September 25, 2006 and August 29, 2007. See [Seeger Weiss Time Records]. Specifically, three partners billed 172.6 hours at $645 to $685 per hour; two associates billed 27.2 hours at $325 to $395 per hour; two accountants billed 1087.5 hours at $225 to $275 per hour; and one paralegal and one executive assistant billed 159.15 hours at $100 to $175 per hour. See id.; 2/14/08 Affidavit of Christopher A. Seeger ("2/14/08 Seeger Aff.") ¶¶ 13-14. The firm's two founding partners, Christopher A. Seeger and Stephen A. Weiss, serve as trustees of the settlement fund, and therefore, a vast majority of the firm's hours stemmed from the allocation of the fund to the individual plaintiffs. See 2/14/08 Seeger Aff. ¶¶ 5, 15-18. Further, Seeger Weiss expended additional time defending a civil suit filed by Aetna, Inc., which had sued the firm based on its role as trustee of the fund. See 2/14/08 Seeger Aff. ¶ 6; 3/4/08 Declaration

of Stephen A. Weiss ¶ 3; 12/17/07 Order (allowing Seeger Weiss to pay for Aetna defense out of settlement fund).

As with Milberg's application, the Court is primarily concerned with the high rates Seeger Weiss charges for non-attorney professionals. Because of Seeger Weiss's position as settlement trustee, the firm utilized two in-house accountants, Leonard S. DePinto ("DePinto") and Dhir Sarin ("Sarin").[19] See 2/14/08 Seeger Aff. ¶¶ 9-10. DePinto is a CPA with nineteen years' experience, who also serves as the firm's Chief Financial Officer. See id. ¶ 9. DePinto's precise contribution to this case is unclear. Seeger Weiss avers that DePinto provided "ample aid" and that his "involvement [] in the administration of the [settlement fund] nearly completely dislocated him from his normal duties. . . ." Id. ¶ 15. There is, however, no submission as to the complexity of accounting services that the settlement administration required, as opposed to the mere volume of his time and services the case commanded. See generally 2/14/08 Seeger Aff.

Seeger Weiss's time records reveal that DePinto spent his time almost exclusively on

_____

[19] Some courts might not allow Seeger Weiss to recoup any hourly fees for its own internal accountants, on the ground that such services are more appropriately subsumed within the firm's overhead costs. See Putnam Leasing Co. v. Fields, 05-CV-141 (RJD) (RML), 2007 WL 2230160, at *6 (E.D.N.Y. June 27, 2007) ("Generally, clerical and secretarial services are considered part of overhead and are not charged to clients") (citation omitted); Wallace v. Fox, 7 F.Supp.2d 132 at App. footnote (D. Conn. 1998) (noting that "support staff . . . are customarily not billed to clients at hourly rates" because "such costs are covered as overhead"). However, because of the magnitude of the allocation process, the in-house accountants were unable to complete their typical duties, and thus, in these circumstances, this Court accepts an hourly rate for DePinto and Sarin. See 2/14/08 Seeger Aff. ¶ 15 (noting that the PSC I accounting duties "crippled [the] firm's entire accounting department, and required the firm's outside accounting firm to take on more responsibilities, resulting in direct out-of-pocket expenses").

"[a]ccounting and administration of [the settlement fund], including preparing letters requesting distribution of funds from the [settlement fund]." See, e.g., 1/31/07 Entry for Leonard S. DePinto; 2/8/07 Entry for Leonard S. DePinto. Taking into consideration that Seeger Weiss's accounting personnel were not actually responsible for calculating the amount of each plaintiff's settlement, but merely in charge of implementing it, see supra note 13, the Court concludes that DePinto's rate should be reduced from $275 per hour to $135 per hour. See Goren, 272 F.Supp.2d at 208 (finding that accountants who prepared reports for court, interacted with attorneys in the case, prepared various financial data documents and supervised paraprofessionals, were entitled to $135 per hour).

In contrast to DePinto, Seeger Weiss details the tasks that Sarin, an accountant with international accreditation, contributed. In particular, Sarin "entered all transactions in the [settlement fund] accounting system[,] . . . reconciled the [settlement fund] accounting books against Citibank's account information daily" and "maintained a file of all payment requests." See 2/14/08 Seeger Aff. ¶ 17. While these tasks required careful attention to detail, the Court is unconvinced that an experienced paralegal could not have handled this mostly administrative work. Thus, the Court reduces Sarin's rate from $225 to $100 per hour. See Goren, 272 F.Supp.2d at 208 (finding that accountants who prepared schedules and sorted and categorized information requiring "a similar level of training and experience to those performed by legal paraprofessionals" were entitled to $50 an hour).

Finally, Seeger Weiss seeks an hourly rate of $175 for Sholom Fishman ("Fishman"), a paralegal with three years' experience, and $100 an hour for Mirna Orellana ("Orellana"), Seeger's executive assistant for the past twelve years. See 2/14/08 Seeger Aff. ¶¶ 11-12, 16.

Seeger Weiss argues that Orellana's contributions to the *Zyprexa* case exceeded her typical secretarial duties and, as such, the firm is entitled to be compensated at an hourly rate. See id. ¶ 16. In particular, Orellana "obtained information from various firms and organized files . . . ." See id. Further, "she prepared, received, or organized all letters requesting distribution of funds from the [settlement fund]," which she also scanned and forwarded to defendant Lilly's counsel. See id. Although scanning letters and forwarding documents on their own could be categorized as typical secretarial duties, the Court finds that the enormity of the undertaking renders the work more akin to paralegal tasks. Because Orellana's experience with paralegal work is uncertain from the application, the Court reduces her hourly rate, as well as Fishman's, to $75, which is more in keeping with this district's practice for paralegals with little experience. See, e.g., Cho, 524 F.Supp.2d at 207 (noting that recent EDNY cases approved $70 to $80 for legal assistants).

Applying these reduced rates, the Court awards Seeger Weiss $268,236.75 in fees.

**D. Calculation of Expenses**

In its current motion, PSC I does not explicitly seek any reimbursement for expenses incurred since PSC I's initial application, but merely requests an order granting fees. See generally 1/25/08 PSC I Mot. The 2007 Time Sheets, incorporated by reference into the current application, include disbursements. See generally 2007 Time Sheets. Accordingly, the Court will award disbursements to the four firms that submitted their 2007 Time Sheets.

The Court concludes that the disbursements sought by Burg Simpson ($538.12) and Douglas & London ($9,237.32) are reasonable. Milberg's expenses are likewise reasonable, except to the extent that the firm calculated its photocopying and network printing costs at

$0.25 per page, rather than the more reasonable rate of $ 0.10 per page.  See, e.g., Staples,

2007 WL 2572175, at *10 (reducing copy rate from $0.20 to $0.10).  Moreover, the Court

deducts meal expenses for Ross Brooks ($13.84) and Mitchell Breit ($10.31), as Milberg has

neither identified these persons nor proffered that either billed any hours.  See generally

Revised Milberg Time Sheets; 2/11/08 Shaughnessy Aff.  Thus, Milberg is awarded

$12,152.17 in disbursements.

Seeger Weiss's expenses suffer from the same deficiencies as Milberg's.  Seeger Weiss

calculates its copying costs at $0.25 per page instead of $0.10.  See [Seeger Weiss Time

Records].  It also requests meal reimbursements for Allen Bulls, an unidentified person who

has not billed any time in the present PSC I application.  Therefore, the Court reduces the

copying charges to $0.10 per page and excludes all meals for Allen Bulls, resulting in

reimbursable expenses of $1,412.93.

### III.    Pro Rata Distribution of Remaining Balance

Finally, PSC I argues that the "remaining balance of the fund should be distributed to

each individual firm based on each firm's overall award percentage in this litigation."  See

PSC I Mem. at 4.  This request, however, disregards Judge Weinstein's 8/25/06 Order, in

which he directed that "any sums left after payment per the magistrate judge's order [awarding

PSC I fees] [] go back into the general escrow fund."  See 8/25/06 Order.  Accordingly, this

Court denies PSC I's motion to distribute pro rata the remaining funds to counsel.

### CONCLUSION

For the work completed since PSC I's initial application, Burg Simpson is awarded

$127,683.50 in fees and $538.12 in expenses; Douglas & London is awarded $62,146 in fees

and $9,237.32 in expenses; Milberg is awarded $186,294.50 in fees and $12,152.17 in expenses; and Seeger Weiss is awarded $268,236.75 in fees and $1,412.93 in expenses. None of the four firms will receive an enhancement of their fees. Further, the Court concludes that the remaining firms that did not submit time sheets showing further work since PSC I's initial application with the Court are not entitled to additional fees. Lastly, the balance remaining in the one-percent set-aside after fees and expenses are disbursed pursuant to this Memorandum and Order will return to the general escrow fund.

      **SO ORDERED.**

**Dated:**    **Brooklyn, New York**
           **April 22, 2008**


                            **ROANNE L. MANN**
                            **UNITED STATES MAGISTRATE JUDGE**